UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

---

In re WOLVERINE FIRE APPARATUS CO.
OF SHERWOOD MICHIGAN,                               Case No. 09-32985

                Debtor.                    Chapter 7

---

LARRY LIEBZEIT, Trustee,

                Plaintiff,

v.                                                  Adversary No. 11-2080

FVTS ACQUISITION COMPANY, INC.,

                Defendant.

---

MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT

---

The plaintiff, Larry Liebzeit, Chapter 7 Trustee, filed an adversary proceeding under 11 U.S.C. §§ 362 and 544 seeking a determination that the defendant, FVTS Acquisition Company, Inc., formerly known as Fox Valley Truck,[1] willfully violated the automatic stay and the resultant postpetition transfer of the debtor's asset is avoidable. Both the plaintiff and the defendant moved for summary judgment. This is a core proceeding under 28 U.S.C. § 157(b)(2)(E), and the Court has jurisdiction under 28 U.S.C. § 1334. The following constitutes the Court's findings of facts and conclusions of law pursuant to Fed. R. Bankr. P. 7052. For the reasons stated below, the plaintiff's motion is granted, in part, and the defendant's motion is denied.

---

[1] In the summer of 2010 Fox Valley Truck's dealership was terminated as a result of the General Motors bankruptcy. For the sake of simplicity, Fox Valley Truck and its successor, FVTS Acquisition Company, Inc., will be referred to interchangeably as "FVTS."

BACKGROUND

Unless specifically noted, the following facts are not in dispute. The debtor, Wolverine Fire Apparatus Co. of Sherwood Michigan, operated a custom apparatus manufacturing facility, which included the construction of fire trucks and other utility vehicles. FVTS was a General Motors dealer authorized to sell and service a line of GMC trucks. On October 14, 2008, Wolverine and FVTS signed a motor vehicle purchase contract for the sale of a new 2008 GMC truck, a medium duty unit consisting of a cab, drive train, and chassis upon which other equipment could be mounted. The contract provided for a sale price of $49,500, that Wolverine would take delivery on December 15, 2008, and that full payment would be due thirty days thereafter. The contract further provided, in part, that "[n]o oral representations are binding unless written on this form," and the written document "is the entire agreement between [Wolverine] and [FVTS], and supersedes any prior agreements and representations, regarding the transactions described above. No modification or waiver of this agreement is enforceable against either party unless agreed to in writing by that party." (Motor Vehicle Purchase Contract, October 14, 2008). The deal was not contingent upon financing and the contract for sale did not include any provisions governing when title to the truck would pass to the purchaser.

Delivery of the vehicle was delayed.[2] Sometime in January 2009, Wolverine informed FVTS that it would not be able to pay for the truck. According to FVTS, it was then that the contract was abandoned and the parties agreed, orally, that Wolverine would take possession of

---

[2]According to FVTS, Wolverine canceled the scheduled delivery. (Affidavit of Mark Arft, October 26, 2011, ¶ 5, 6). According to the trustee, FVTS delayed delivery of the truck and Wolverine did not object to the delay. (Affidavit of Shane Williams, September 22, 2011, ¶ 3).

2

the truck as a "demonstrator."[3] The trustee claims the contract was never abandoned, but was instead orally amended. Based upon the parties' oral agreement – and despite the lack of any other written agreement – the truck was delivered to Wolverine in February 2009.

Wolverine constructed a fire truck on the chassis and eventually moved the completed truck to First Choice Truck in Phoenix, Arizona. FVTS did not file a UCC-1 Financing Statement with respect to any contract. It also did not apply to the Wisconsin Department of Transportation for a certificate of title showing any buyer as the owner and did not effectuate a new buyer manufacturer's warranty. Instead, FVTS retained the physical title to the truck and maintained the vehicle on its inventory list, subject to the security interest of GMAC. The truck also remained listed on the General Motors' database of dealers' inventory and was listed on the Commercial Truck Trader, a database of vehicles available for sale. At the request of FVTS, Wolverine kept the former advised of the location of the truck. At no time did FVTS ever send Wolverine a bill, invoice or statement showing an amount due for the sale of the truck, and the truck was never listed on FVTS's accounts receivable.

Wolverine filed a chapter 11 petition on September 8, 2009, and the case was subsequently converted to chapter 7 on March 12, 2010. In the summer of 2010 FVTS, then operating as Fox Valley Truck, was notified that its dealership was being terminated in the wake of the General Motors bankruptcy, and it was required to liquidate its entire inventory of GMC trucks by October 31, 2010. With knowledge of the bankruptcy filing, two employees of FVTS retrieved the truck from Phoenix and transported it to its business in Appleton, Wisconsin. Prior

---

[3]Shane Williams stated the parties "entered into an agreement whereby Wolverine would upfit the chassis delivered into a demonstration model water tank truck and retain possession of the truck as a demonstration model." (Affidavit of Shane Williams, September 22, 2011, ¶ 5).

3

to transport, they removed the water tank – with the consent of Shane Williams, Wolverine's President – and left it at First Choice Truck. FVTS eventually sold the truck to a sister corporation, Valley Truck Leasing, for $50,000.00. At no time during the pendency of the bankruptcy case did FVTS seek relief from the automatic stay. Additionally, the truck was not shown on the debtor's schedules and FVTS was not listed as being among its creditors.

ARGUMENTS

*Arguments of the Chapter 7 Trustee*

The trustee argues the debtor acquired ownership and title to the truck upon its delivery pursuant to Wis. Stat. § 402.401(2), and the truck is properly part of the bankruptcy estate. The truck was delivered to the debtor pursuant to an altered sales contract between the debtor and FVTS. Because FVTS did not perfect a security interest in the truck via a UCC filing statement and merely kept the certificate of title, it retained, at most, an unperfected security interest in the truck following its delivery to the debtor. *See* Wis. Stat. §§ 402.401, 409.203. Accordingly, FVTS's postpetition retrieval of the truck was done in willful violation of the automatic stay and the value of the truck is therefore recoverable by the trustee pursuant to 11 U.S.C. § 362(k)(1). Alternatively, FVTS's retrieval of the truck was an unauthorized postpetition transfer of the debtor's property and is therefore avoidable by the trustee pursuant to 11 U.S.C. § 549(a). Likewise, due to FVTS's failure to retain a security interest in the truck following its delivery to the debtor, the trustee is entitled to recover its value pursuant to 11 U.S.C. §§ 544(a)(1)-(2) and 550(a).

The trustee further argues that even if FVTS's contention that it was a bailor and the debtor was acting as a consignment agent in order to facilitate a sale of the truck, the truck would

4

still be part of the bankruptcy estate. FVTS's arrangement with the debtor was predicated upon the ultimate sale of the vehicle. As the debtor added value to the truck through its upfitting, and held it for eventual sale, the debtor's alleged consignment agreement subjected the truck to the claims of the debtor's creditors such that the truck is part of the estate even if ownership did not transfer to the debtor. *See* Wis. Stat. § 402.326(1)-(2) ("Goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession."); *In re Corvette Collection of Boston, Inc.*, 294 B.R. 409 (Bankr. S.D. Fla. 2003) (consigned vehicles subject to claims of debtor's creditors). FVTS took no steps to identify its alleged continuing ownership of the truck or affirm that the arrangement was only a "sale on approval" and not subject to the claims of the debtor's creditors. *See Houghton Wood Prods., Inc. v. Badger Wood Prods., Inc.*, 196 Wis.2d 457, 538 N.W.2d 621 (Ct. App. 1995) (presumption of goods delivered for sale to others runs against the arrangement being a sale on approval).

According to the trustee, regardless of whether ownership of the truck passed to the debtor with its delivery or whether the vehicle was held by the debtor for sale or return to FVTS, the debtor acquired an interest in the truck, whether legal or equitable, sufficient to make the truck property of the estate pursuant to 11 U.S.C. § 541.

*Arguments of FVTS*

FVTS argues the contract for sale had been abandoned by the time the debtor obtained possession of the truck as a demonstrator. The contract provided that the debtor was to have taken delivery by December 15, 2008, and was not required to pay for it until thirty days later. Delivery was canceled prior to the December 15 date and the debtor informed FVTS that it

5

would not be able to pay for the truck.  At that point, FVTS regarded the contract as a dead letter and resumed its efforts to sell the truck to someone else.  The parties also reached a new agreement by which the truck was loaned to the debtor as a demonstrator.  A "demonstrator" is a vehicle in a dealer's inventory that is loaned to a prospective customer for it to try out.  Under such an agreement, the prospective customer takes possession of the vehicle, but ownership remains with the dealership.

Contrary to the trustee's contention that the written sale contract was orally amended to provide for a later delivery date and conversion into a demonstrator model, the contract itself precluded oral amendments.  Additionally, Wisconsin case law has not developed clear guidelines as to the determination of ownership.  For instance, in *Knutson v. Mueller*, 68 Wis.2d 199, 228 N.W.2d 342 (1975), the supreme court held that strict compliance with the Vehicle Title and Anti-Theft Law, Wis. Stat. § 342.16, governed the issue of ownership, and found that the transfer of a certificate of title was the defining event, something that did not happen in this case.  On the other hand, FVTS acknowledges that in the case of *National Exchange Bank of Fond du Lac v. Mann*, 81 Wis.2d 352, 260 N.W.2d 716 (1978), the supreme court determined that even though a new title had not been issued, ownership of the car had passed to the buyer when he took possession, by way of Wis. Stat. § 402.401(2).

The supreme court recognized the divergent statutes in *Bacheller v. Employers Mut. Liability Ins. Co.*, 93 Wis. 2d 564, 573, 290 N.W.2d 872 (1980), and harmonized those concepts by holding the issue of title transfer is conclusive only when the Vehicle Title and Anti-Theft Law has been complied with, but that "where [the certificate of title] has not been endorsed and delivered, the intent and conduct of the parties govern."  In this case, the question of who owned

6

the truck cannot be determined solely by the fact that possession had been given to the debtor. Even more importantly, Wis. Stat. § 402.401(2) does not determine whether there has been a sale – it only determines when title passes when there is a sale.

According to FVTS, the conduct of the parties provides sufficient undisputed evidence from which to conclude that the transaction under which the debtor had possession of the truck was a bailment, not a sale. *See Moore v. Relish*, 53 Wis.2d 634, 193 N.W.2d 691 (1972); *American Nat'l Red Cross v. Banks*, 265 Wis. 66, 60 N.W.2d 738 (1953). FVTS transferred the truck to the debtor after being advised that the debtor would not be able to pay for it. It never applied to the Department of Transportation for a new certificate of title showing the debtor as the owner and the debtor never requested that it do so. Although expressly provided for in the sale contract, FVTS never placed the manufacturer's warranty in effect for a new buyer. FVTS continued to expose the truck to potential buyers through its listings on its inventory list and commercial trader database, as well as on General Motors' database of dealers' inventory. At the request of FVTS, Wolverine kept the former advised of the location of the truck. At no time did FVTS ever send Wolverine a bill, invoice or statement showing an amount due for the sale of the truck, and the truck was never listed on FVTS's accounts receivable. The truck was not listed on the debtor's schedules and FVTS was not named as a creditor in the bankruptcy documents. Although the trustee contends that the lack of a security agreement between FVTS and the debtor is evidence that the trustee's rights are superior to FVTS, the lack of a security agreement is instead further evidence of a lack of sale between the parties. The president of the debtor, Shane Williams, consented to FVTS taking possession of the truck after the bankruptcy, but he insisted that it first remove the water tank – evidence of the debtor's distinction between ownership of the
7

truck and the tank. The conduct of the parties show that the transaction under which the debtor had possession of the truck was a bailment, not a sale.

DISCUSSION

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255.

*Alleged Willful Violation of the Automatic Stay*.

Filing a petition for bankruptcy triggers the automatic stay provisions of 11 U.S.C. § 362. *In re Radcliffe*, 563 F.3d 627, 630 (7th Cir. 2009). "A willful violation does not require specific intent to violate the stay; it is sufficient that the creditor takes questionable action despite the awareness of a pending bankruptcy proceeding." *Id*. at 631. Generally, a violation is considered willful when a creditor acts intentionally. *Miller v. United States*, 422 B.R. 168, 174 (W.D. Wis. 2010). "Not even a good faith mistake of law or a legitimate dispute as to legal rights relieve a

8

willful violator of the consequences of its act." Susan V. Kelley, Ginsberg & Martin on Bankruptcy, § 3.01(B)(3) (5th ed. Supp. 2012). At all times, FVTS conducted itself as though it was the rightful owner of the truck and, if that presumption is deemed correct, seeking relief from the automatic stay would have been unnecessary. This would not have been an unreasonable assumption on FVTS's part, given the ample documentation that it retained ownership. Also, it had Shane William's permission to recover the truck in Arizona. So, while it has yet to be determined whether or not FVTS had the right to take possession of and sell the truck without first seeking relief from the automatic stay, it is clear to this Court that any violation of the automatic stay would have been merely technical and without any damage to the trustee's interest. Because "a court will not impose sanctions under § 362[(k)] when there has been a mere technical violation of the stay or where the creditor has acted in good faith," *In re Welch*, 296 B.R. 170, 172 (Bankr. C.D. Ill. 2003), the trustee will not be awarded any punitive damages for the alleged violation. Whether or not the trustee is entitled to recovery of the truck or an award equal to the value of the truck pursuant to other provisions of the Bankruptcy Code will be discussed below.

*Motor Vehicle Purchase Contract.*

The trustee contends the truck was delivered to the debtor pursuant to an altered sales contract[4] between FVTS and the debtor. FVTS argues the contract for sale had been abandoned

---

[4]The contract used here conformed to the motor vehicle trade practices required in sales to retail purchasers, as set forth in Chapter 218 of the Wisconsin Statutes and Chapter 139 of the Wisconsin Administrative Code. Presumably, a different contract is allowable when a transaction is made between a dealer and a wholesale purchaser, such as the debtor. (For definitions of a non-retail purchaser, see Wis. Stat. § 218.0101(23)(a), Wis. Admin. Code Trans. §§ 130.02(13), 137.03(3)). Nevertheless, according to the Wisconsin Administrative Code, a motor vehicle purchase contract is executed "whenever the dealer accepts a down payment,

9

by the time the debtor obtained possession of the truck as a demonstrator.  Generally, both the UCC statute of frauds and the contract itself require that modifications must be in writing.  *See* Wis. Stat. § 402.209(2).  There are recognized exceptions to the statute of frauds requirement, however, such as waiver by a party's course of conduct or partial performance of the modified contract.  *See* Wis. Stat. §§ 402.209(4), 402.201(3).

The first exception to the statute of frauds is waiver of the writing requirement.  Wis. Stat. § 402.209(4); *see also Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, 290 Wis.2d 264, 714 N.W.2d 530 (2006).  Section 402.209(4), Wis. Stat., states that "[a]lthough an attempt at modification or rescission does not satisfy the requirements of sub. (2) [clauses requiring that modifications be in writing are enforceable] or (3) [statute of frauds] it can operate as a waiver."  Wis. Stat. § 402.209(4).  The state supreme court has noted that waiver requires an inquiry into the intent of the parties, which may be inferred as a matter of law from the conduct of the parties.  *Royster-Clark*, 2006 WI 46 at ¶ 21, 290 Wis.2d at 276.  "Generally speaking, if the record supports the inference that the parties intended to modify the contract, then a waiver pursuant to § 402.209(4) has occurred."  *Id*. at ¶ 23, 290 Wis.2d at 277.

The facts currently before the Court evidencing an attempt at modification are sparse. The individuals involved, Shane Williams, principal owner of the debtor, and Mark Arft, general manager of FVTS, presumably had authority to bind their respective parties.  However, we have no evidence regarding any ongoing relationship between the debtor and FVTS or any other course of dealings between them.  The parties do not agree on the specific reasons for the delayed

---

deposit or title for trade-in unit from a prospective purchaser." Wisconsin Admin. Code Trans § 139.05(1)(b).  While arguably inapplicable to this case, the Court notes that the contract was never "executed" under the standards set forth in the Administrative Code.

10

delivery, although they both acknowledge the truck was to be used as a "demonstrator." By delivering the truck for modification without any documentation for a purpose other than the originally contemplated sale, the parties unequivocally waived any requirement that their arrangement be in writing.

Wisconsin Stat. § 402.208(3) provides that a course of performance inconsistent with any terms of an agreement shall be "relevant to show a waiver or modification" of that term. The parties definitely performed at variance with the terms of the written sales contract: the delivery date on the contract was not met, the debtor was never billed pursuant to the terms of the contract, no written amendments to the contract were ever executed, and a new certificate of title was never applied for. These factors, however, also demonstrate that the sales contract was abandoned. *Cf. Henry ex rel. Weis v. General Cas. Co.*, 225 Wis.2d 849, 593 N.W.2d 913 (Ct. App. 1999) (despite parties' subjective belief that purchase occurred, no valid and binding motor vehicle purchase contract was executed and, as matter of law, dealer never transferred ownership to potential purchaser of vehicle).

The second exception to the statute of frauds writing requirement is performance of the terms of the contract. Wisconsin Stat. § 402.201(3) provides, in relevant part, that "[a] contract which does not satisfy the requirements of sub. (1) but which is valid in other respects is enforceable ... [w]ith respect to goods for which payment has been made and accepted or which have been received and accepted." It is undisputed that the truck was never paid for. Both parties also acknowledge that the truck was delivered to the debtor. The supreme court has recognized that "[p]art performance under Wis. Stat. § 402.201(3)(c) occurs when a buyer accepts the product and the seller participates in, or expresses assent to, the change in possession

11

and *control of the product.*" *Royster-Clark*, 2006 WI 46 at ¶ 41, 290 Wis.2d at 285 (emphasis added). Although FVTS assented to change in possession, it clearly disputes that it assented to change in control of the truck.

If the contract is found to have been abandoned, then the parties would not have been able to resurrect a subsequent sale because the UCC statute of frauds provides that "a contract for the sale of goods for the price of $500 or more is not enforceable ... unless there is some writing sufficient to indicate that a contract for sale has been made between the parties...." Wis. Stat. § 402.201(1).

This Court is satisfied that the undisputed facts show the sales contract was abandoned. The conduct of the parties makes clear that the debtor unequivocally indicated it could not pay for the vehicle, and FVTS acquiesced in this reality when it physically transferred the truck anyway. It never treated Wolverine as a buyer, and both parties acted as if it were not. Title was not transferred, there were no DMV or UCC filings, Wolverine kept FVTS informed of the truck's location, FVTS did not show in its records that Wolverine owed it the purchase price, and Wolverine did not list the truck on its schedules. Therefore, there was no sale.

*Bailment of Vehicle.*

FVTS argues the conduct of the parties provides ample evidence from which to conclude that the transaction under which the debtor had possession of the truck was a bailment, not a sale. The trustee contends that even if FVTS was a bailor and the debtor was acting as a consignment agent in order to facilitate a sale of the truck, the truck was still a part of the bankruptcy estate.

Foremost, the Court must point out that while every "consignment" involves a "bailment" of sorts because goods are entrusted to a third party, not every "bailment" is a "consignment."

12

The supreme court has noted that the legislative history of Wisconsin's UCC section on sales, Wis. Stat. § 402.326 (creditors' rights in assets transferred to a debtor on approval and sale or return), shows that it was not intended to apply to those bailments that are merely a temporary entrustment of possession of goods, subject to further events, such as acceptance. Instead, it was intended to apply only to bailments when the delivery may, in one way or another, be properly classified as a consignment. *Armor All Prods. v. Amoco Oil Co.*, 194 Wis.2d 35, 50-53, 533 N.W.2d 720 (1995). A "true consignment" creates a simple sales agency in which goods are delivered to a dealer for resale purposes, and this device is used as a price-fixing arrangement whereby the consignor may direct that the consignee charge a certain price for the goods. Both parties anticipate that the goods will eventually be transferred to a third party, and the consignor will be paid thereafter, usually with payment reduced by the consignee's fee. There is no allegation here that FVTS would direct the amount of the sale price to a third party, so this arrangement is not a "true consignment." On the other hand, "security consignment" involves the delivery of goods to a merchant who has been induced to accept them by agreement from the consignor permitting their return in lieu of payment if they are not resold. In the case of a security consignment, to provide security to the consignor, the consignor maintains title to the goods. *Id*. at 51. Finally, a true bailment of goods is not a sale or consignment sale and, thus, the UCC section defining creditors' rights to goods in consignment sale situations should not apply to true bailment situation. *Id*. at 53. A bailment without more does not create a consignment. *Id*. at 55.

    It is worth noting that if this transaction had been purely a bailment, then the Uniform Commercial Code would be inapplicable. This Court is satisfied, however, from the undisputed

conduct of the parties, that the transfer of the truck in question was a consignment of some sort, although not a "true consignment," and not a pure bailment. The parties acknowledged they anticipated a sale to a third party once the modifications were installed. The sale might also have been to Wolverine, although both sides realized the debtor could not pay contemporaneously with the physical transfer, and there is no allegation by either that Wolverine intended to pay or could pay in the future. FVTS authorized the addition of the tank, which was obviously for the benefit of a third party buyer, not FVTS. Again, both parties' records show FVTS retaining title. The facts presented are not in writing and do not inform us how a price to a third party would be set or how the proceeds were to be divided between the debtor and FVTS. This uncertainty, however, does not negate the fact that both parties intended a sale of the truck and it was not intended for return to FVTS in its modified form. Since the consignment arrangement was performed up to sale to a third party, the exception to the statute of frauds for partial performance applies. Thus, the elements of a consignment, not a pure bailment, exist. Therefore, the Court must consider UCC Article 2 - Sales, Wis. Stat. § 402.326, and/or UCC Article 9 - Secured Transactions, Wis. Stat. Ch. 409.

*Transactions Under UCC Article 2 and Article 9.*

Prior to the enactment of the UCC, rights in property delivered under contracts contemplating resale by a merchant who was to have the privilege of returning any goods that were found unsalable depended largely on whether the particular transaction constituted a "consignment for sale" or a "sale or return." The distinction between the two transactions was that the "consignment for sale" merely created the relationship of principal and agent, with title not passing out of the principal, i.e., the original seller. A "sale or return" vested title to the

property in the first instance in the merchant, with an option to return, usually because the merchant had been unable to sell the goods to third parties. At this point, title transferred back to the seller. A contract was construed to constitute a "consignment for sale" and not a contract of "sale or return" where it appeared that it was never intended that the title should pass to the merchant at any time or under any conditions, and even if the goods were described as taken on "sale or return," the terminology was not necessarily conclusive of the real nature of the transaction. *See* Gary D. Spivey, *Consignment Transactions Under Uniform Commercial Code Article on Secured Transactions*, 58 A.L.R. 6th 289 § 2 (2010).

In Wisconsin, if delivered goods may be returned by the buyer, the transaction is a "sale on approval" if the goods are delivered primarily for use and a "sale or return" if the goods are delivered primarily for resale. Wis. Stat. § 402.326(1). The distinction is crucial to a determination of whether the goods were subject to claims of the merchant's creditors: "Goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession." Wis. Stat. § 402.326(2). While the UCC recognizes a sale on approval can exist in a commercial setting, there is a presumption based upon sound public policy against categorizing a commercial relationship as a sale on approval. *Houghton Wood Prods, Inc. v. Badger Wood Prods., Inc.*, 196 Wis.2d 457, 464, 538 N.W.2d 621 (Ct. App. 1995). The arrangement entered into by the debtor and FVTS was not a sale on approval as the debtor was not the end user.

For purposes of determining the applicability of Wisconsin's UCC section concerning creditors' rights to goods in consignment sale situations, the subjective intent of the parties does not control; instead, the test is whether an objective analysis of the transaction documents, the

15

course of performance between the parties, the relative control between the bailor and the bailee, and the bailee's actions could lead a reasonable creditor to conclude that a consignment existed. All reasonable doubts as to whether the transaction was a consignment must be resolved in favor of the general creditors of the consignee. *Armor All Prods.*, 194 Wis.2d at 56. Here, that means the chapter 7 trustee.

In this case, the debtor modified the vehicle by adding a water tank. As the appellate court noted, "[i]t violates common sense and the rules of commerce to permit transformed goods to remain titled to the seller ... when a good is used in the manufacturing process where it undergoes transformation and is subsequently resold. ... [I]t is not delivered for 'use' as that term is used in the [UCC and the] transaction cannot be a delivery for 'use' contemplated by § 402.326(1), Stats.," and thus is not a sale on approval. *Houghton Wood Prods.*, 196 Wis.2d at 471-72. Furthermore, the debtor was not in the business of *using* the trucks it modified; it sold them, and it intended to sell this one. Also, the debtor's modifications were, apparently, rather easily undone, and FVTS did so before it took possession of the truck and sold it to its sister corporation, so it obviously was not irreparably modified, as goods purchased for use in manufacturing might be.

In contrast to the protections provided by UCC Article 2 to a "true" consignment, the UCC affords protections for transactions "intended as security," in UCC Article 9. With the adoption of the 2001 revisions to the UCC – insofar as creditors of the consignee are concerned – the priority of the consignor's interest became similar to that of a purchase-money security. *See* Wis. Stat. § 409.103(4). Thus, the priority of the consignor's interest as against the rights of lien creditors of the consignee, competing secured parties, and purchasers of the goods from the

16

consignee can be determined by reference to the priority rules generally applicable to inventory. *See, e.g.,* Wis. Stat. §§ 409.317, 409.322. Subject to notice requirements, a consignor's perfected interest, treated as a perfected purchase-money security interest in inventory, generally has priority over a conflicting security interest in the same inventory. Wis. Stat. § 409.324(2). If the consignor's interest in not perfected, then, for purposes of determining the rights of creditors of the consignee while the goods are in the possession of the consignee, the consignee is deemed to have the rights and title to the goods identical to those that the consignor had or had power to transfer. In other words, if the consignor had been the owner of the goods, the consignee would be deemed the owner of the goods vis a vis the consignee's creditors. As a result, creditors of the consignee debtor can acquire judicial liens and security interests in the goods. Wis. Stat. § 409.319. If the consignee is deemed the owner, then those rights pass to the trustee as property of the estate under 11 U.S.C. § 541

If the consignor fails to perfect its security interest by filing a UCC financing statement – and there is no question FVTS failed to do so – its interest is subordinate to a perfected claim by the consignee's creditors against consigned goods in the consignee's possession. Consequently, under certain circumstances, a trustee of the consignee's bankruptcy estate may have a superior claim to the claim of the consignor. 11 U.S.C. § 544(a). There are, naturally, exceptions[5] to this principle.

Consignments have been found where no written instrument was executed. For instance, in an action by a secured creditor that had provided financing to the later-insolvent retailer and

---

[5] As noted above, a "true consignment" under Wis. Stat. § 402.326 is not subject to the filing requirements of Article 9. This transaction was not a true consignment.

17

had perfected its security interest in the retailer's inventory, the court found an "oral consignment agreement" was a consignment intended for security under former Article 9. *General Elec. Credit Corp. v. Strickland Div. of Rebel Lumber Co., Inc.*, 437 So. 2d 1240 (Ala. 1983). The supplier of metal buildings shipped buildings to a retailer subject to a "sales agreement" invoice requiring the retailer to pay the wholesale price plus a 5% "upcharge" for each building sold at any price set by the retailer and an "upcharge" of 5% of the wholesale price for any building returned to the supplier. Provisions of the agreement giving the retailer complete control over the buildings, subject only to the requirement that he remit the wholesale cost for each building to the supplier as each was sold, allowed him to keep whatever profit he was able to realize over the wholesale price. The agreement absolutely obligated him to pay the supplier the 5% upcharge even if he was unable to sell the buildings, and each invoice described itself as a "purchase agreement." The court held that the agreement did not support a finding that the retailer was acting as the supplier's agent in selling the buildings, but, to the contrary, supported a finding that the agreement was the functional equivalent of the secured creditor's floor plan financing agreement with the retailer.

Likewise, an oral title retention agreement under which lighting fixtures were delivered to a dealer who agreed to display them in his studios and to pay the wholesale price for any items that he sold, and who was empowered to fix the resale price, was held to constitute a consignment intended for security in *In re De'Cor Wallcovering Studios, Inc.*, No. 70-BK-636, 1970 WL 12611 (Bankr. E.D. Wis. August 24, 1970) (applying Wisconsin law). The bankruptcy referee reasoned that, since the dealer had the right to determine the resale price, the consignment was not a price-fixing device but rather was intended as security.

18

The facts in the above-cited cases are clearly distinguishable from this case, but they do illustrate instances in which oral agreements were found to be consignments intended for security. That is what occurred in this case. FVTS eventually intended to be paid, and it tried to do so by retaining title to the truck, keeping it in inventory, showing it as owning it on its web site, and keeping tabs on its location. These mechanisms would make it impossible for the debtor to transfer good title to a buyer without FVTS' consent and presumably payment. This is the very nature of a security interest. *See* Wis. Stat. § 409.103(4). Unfortunately, FVTS did not perfect any security interest in the vehicle, and the interest of the chapter 7 trustee intervened. Since an unperfected security interest is avoidable under 11 U.S.C. § 544, the trustee stands in the shoes of the debtor's creditors under state law. Those creditors have superior rights to those of the unperfected secured creditor under state law, and so does the trustee.

There are circumstances under which subordination of the consignor's interests to the debtor's creditors is not warranted. For instance, the UCC provision subordinating the consignor's security interest does not apply where it is shown that the consignee was "generally known" by its creditors to be substantially engaged in selling the goods of others. *In re Fariba v. Dealer Servs. Corp.*, 178 Cal. App. 4th 156, 100 Cal. Rptr. 3d 219 (Ct. App. 2009) (holding secured creditor had actual knowledge that consignee was engaged in such sales brought case within "generally known" exception and precluded subordination of consignor's claim). Courts have also consider whether the chattel was held "for sale" when determining the transactional nature of delivered chattel. *See, e.g., In re Greenline Equip., Inc.*, 390 B.R. 576 (Bankr. N.D. Miss. 2008) (equipment placed at debtor's lot for "display until shipment" was not consignment); *In re Georgetown Steel Co., LLC*, 318 B.R. 352 (Bankr. D. S.C. 2004) (rejected argument by

19

supplier who delivered hot briquetted iron to manufacturer for use as raw material that transaction was not a consignment because goods were not delivered for the purpose of sale; if goods are delivered for another purpose as well, such as milling or processing, the transaction is a consignment nonetheless because a purpose of the delivery is a "sale"). There is no allegation that the debtor was "generally known" to offer for sale property it does not own, so this exception to the requirement of perfection to preserve the consignor's interest does not apply.

## CONCLUSION

The technical violation of the automatic stay by FVTS did not result in damages to the trustee, and his request for sanctions is denied. 11 U.S.C. § 362(k). There was no sales contract between the debtor and FVTS, the original contract having been abandoned. The subsequent arrangement was a "consignment for security" which was unperfected and subject to avoidance by the trustee. 11 U.S.C. § 544(a). Upon filing, the truck became property of the debtor's estate. Because the interests of third parties in the truck have intervened, the trustee shall recover an award equal to the value of the truck. 11 U.S.C. § 550(a).

A separate order consistent with this opinion will be entered.

January 31, 2012

Margaret Dee McGarity
United States Bankruptcy Judge

20

Case 11-02080-mdm    Doc 30    Filed 01/31/12    Page 20 of 20